2025 IL App (3d) 240351

Opinion filed August 14, 2025

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE CITY OF LA SALLE, | ) | Appeal from the Circuit Court |
| | ) | of the 13th Judicial Circuit, |
| Petitioner-Appellee | ) | La Salle County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-24-0351 |
| | ) | Circuit No. 24-CH-6 |
| | ) | |
| JAMIE M. HICKS, | ) | Honorable |
| | ) | Jason Helland, |
| Respondent-Appellant. | ) | Judge, Presiding. |

JUSTICE DAVENPORT delivered the judgment of the court, with opinion.
Justice Anderson concurred in the judgment and opinion.
Presiding Justice Brennan dissented, with opinion.

**OPINION**

¶ 1 Respondent, Jamie M. Hicks, appeals from a plenary workplace protection restraining order entered under the Workplace Violence Protection Act (Act) (820 ILCS 275/1 *et seq.* (West 2024)) in favor of petitioner, the City of La Salle (City).

¶ 2 We agree with Hicks's contention that the City's evidence did not satisfy section 15(2) of the Act (*id.* § 15(2)). Though we defer to the trial court's factual finding that Hicks made a credible threat of violence, we conclude the threat was not a "credible threat of violence *to be carried out*

*at the employee's workplace*." (Emphasis added.) *Id.* Therefore, we reverse the trial court's judgment.

¶ 3                                I. BACKGROUND

¶ 4        In 2023, Hicks began regularly attending city council meetings to express his frustrations with the City's response to a chemical plant fire in La Salle. He also began to disseminate—via his Facebook page and a YouTube channel called the Jamie Hicks Show—his views and opinions regarding the City's response and his frustration with city officials. According to the City, Hicks became increasingly agitated, aggressive, and disruptive over time, to the point where he had to be removed from two city council meetings. Hicks's escalating behavior culminated on February 29, 2024, when he allegedly threatened the City's finance director in the La Salle County courthouse, where a Pollution Control Board meeting was about to begin.

¶ 5                        A. The Petition and Emergency Order

¶ 6        On March 28, 2024, the City petitioned under the Act for a workplace protection restraining order (workplace restraining order) against Hicks. The City proceeded under section 15(2) of the Act, which provides an employer may seek a workplace restraining order if "an employee believes that the respondent has made a credible threat of violence to be carried out at the employee's workplace." *Id.* In support, the City attached affidavits from its finance director, John Duncan; its public works superintendent, Kevin Fay; and its wastewater treatment superintendent, Melanie Johnstone.

¶ 7        In April 2024, the trial court held a hearing on whether an emergency workplace restraining order should issue. See *id.* § 70 (permitting the court to enter emergency orders). Hicks was served and appeared with counsel. The court heard testimony from Duncan and Hicks and entered an emergency workplace restraining order. That order is not at issue in this appeal.

2

¶ 8                                    B. Hearing on the Plenary Order

¶ 9          In May 2024, the court held a hearing on whether a plenary order should be entered. The City's evidence to support its petition fell into three categories: (1) Hicks's increasingly aggressive and disruptive behavior during city council meetings, (2) Hicks's online content, and (3) Hicks's February 29 verbal threat to Duncan. The court heard testimony from Duncan, Fay, Hicks, and Hicks's friend and concerned city resident, Dawn Hicks (no relation). (We will refer to Dawn Hicks by her first name to avoid confusion.) The court also admitted several video exhibits, including clips taken from Hicks's Facebook and/or YouTube channels.

¶ 10         The video exhibits and hearing testimony showed the following.

¶ 11                             1. *Hicks's Behavior at City Council Meetings*

¶ 12         After the chemical plant fire, Hicks began regularly attending city council meetings. According to Duncan, Hicks became "increasingly angry" and "more obsessive" in November and December 2023. He would disrupt city council meetings, yelling comments from the back of the chamber. During public comment periods, Hicks appeared agitated. He spoke loudly, aggressively, and hostilely, and he used obscenities. Dawn agreed that Hicks's behavior at the meetings could come off as aggressive, but she believed Hicks's passion and frustration were mistaken for aggression. No witness testified that Hicks ever threatened physical violence at any city council meeting.

¶ 13         Hicks sometimes directed his outbursts at specific city officials or employees. At first, Hicks directed his agitation at the fire chief and then at the police chief, Michael Smudzinski. He had also been "pretty belligerent" toward the mayor, cursing him and making personal attacks.

¶ 14         Hicks's disruptive behavior resulted in his removal from two city council meetings, on February 5, 2024, and in April 2024. As to Hicks's first removal, Duncan provided no details other

than stating that Hicks was removed for "interrupting the meeting with comments from the back." Duncan was not present for Hicks's second removal.

¶ 15 In the April 2024 meeting, Chief Smudzinski forcibly removed Hicks following his public comment. According to Hicks, an alderman addressed him as he "was leaving the stand." Hicks told the alderman, "this was up here and you were here" and leaned against the stand with his legs crossed. At that moment, Chief Smudzinski grabbed Hicks, told Hicks he was a public safety threat, and removed him from the meeting.

¶ 16 Duncan testified Hicks began directing his anger at Duncan after his removal from the February 5 meeting. Hicks disagreed, stating he began directing his anger toward Duncan when he learned Duncan had been untruthful with a journalist about the circumstances of the removal.

¶ 17 As the City's finance director, Duncan works primarily at city hall. He also performs duties at other locations, including the fire station, the city garage, and the wastewater treatment plant. Duncan regularly attends city council meetings in his capacity as finance director.

¶ 18 *2. Hicks's Online Content*

¶ 19 Shortly after the January 2023 fire, Hicks began using Facebook and YouTube to post videos documenting his frustrations with the City's response to the fire. Hicks explained he began posting online as "an advocate for the people" after he realized the City and the chemical company were not being truthful with the public. According to Hicks, he used his videos to inform people about the reality of the City's response. He acted differently on his YouTube "show" than he did in public meetings.

¶ 20 The City introduced four clips from his video content, which were admitted into evidence. The clips are not dated. Based on their content, it appears only one clip predated the February 29 verbal threat.

4

¶ 21    In that clip, Hicks discussed his interactions with the police department. He then made the following statement: "Don't worry man, I'm not giving up until somebody is hanging on some f*** noose somewhere and paying the pied f*** piper his f*** fee. Toot f*** toot on that f*** horn and that's the truth." Hicks testified the omitted context of the statement would show he was not making a threat but, rather, was talking about holding the City government accountable for its "lack of actions in this matter" and voting the mayor and council out of office.

¶ 22    One of the remaining clips was taken from a livestream that Hicks posted the day before the City filed its petition. The clip begins with Hicks stating the mayor of Streator is married to the City's economic director. At some point, Dawn posted a written comment on the livestream, stating, "[Mayor] Grove doesn't speak because he's got Duncan's micropenis in his mouth [face with tears of joy emoji]." Hicks appears to read his screen before saying,

> "micropenis is in his mouth. Oh I love it! Yeah because he's a womanizing piece of s***. I can't even believe that man. Oh Duncan. Oh Duncan. How I had you so pegged so wrong. Jeez. Just in a couple weeks ago, three weeks ago, I thought you were an alright guy. You've ruined that motherf*** pretty drastically."

¶ 23    The remaining two clips were taken from livestreams that Hicks posted on an unidentified date after the hearing on the emergency workplace restraining order. In one of these clips, Hicks noted there was video footage of Duncan putting his hands on Hicks after Hicks's removal from the February 5 meeting. Hicks threatened to press charges against Duncan for battery and rejected Duncan's claim that he was only there as a witness for the police chief. He accused Duncan of defaming him by falsely claiming Hicks "told everyone to shut the f*** up and this, that. He also promised to present the vindicating video footage to the court. At the end of the clip, Hicks

5

predicted "it's gonna get bumpy for the other motherf*** side" and directed his final message to the mayor, saying "Keep trying. You ain't stopping s***."

¶ 24    In the other clip, Hicks stated,

"Peace out people. Keep on with the keep on. F*** trolls, keep up with me. Keep up with me. I can't wait for Friday Duncan. I'm ready. I'm ready for it. You f*** is going to get what coming to you because you didn't—you just—you're gonna get what's coming to you. You're gonna look like a fool. And I can't wait, because I got every ounce of f*** evidence to back everything I say up."

¶ 25    At the hearing, Duncan testified Hicks had also made a statement online about "wanting to help the mayor cut his finger off because he was wearing his wedding ring." Duncan also testified that some of Hicks's content had addressed Duncan's family members but provided no details. Hicks testified he spoke about Duncan's father, who was a former alderman, but not about Duncan's wife or children. Duncan was "very bothered" by Hicks's online content. It caused him to fear for his own safety and the safety of others at city hall.

¶ 26                                    3. *The February 29 Verbal Threat*

¶ 27    The parties presented conflicting evidence on what occurred at the February 29 Pollution Control Board meeting.

¶ 28    Duncan testified he attended the meeting in his capacity as finance director and potential witness. At the time of the meeting, Duncan and Hicks had a "civil" relationship. While Duncan was concerned about Hicks's behavior, he was not yet afraid of Hicks.

¶ 29    Duncan drove with Fay, Johnstone, and another city employee. They arrived early in the courtroom and all took seats in the back row, in the chairs furthest from the door. Duncan sat in the last chair of the row. Fay sat next to Duncan, and Johnstone sat next to Fay. Duncan chose his

seat because he "wanted to be far away from the door" to avoid an encounter with Hicks. Duncan acknowledged the courthouse was not owned or leased by the City and was not his workplace.

¶ 30    Hicks arrived with his daughter, Briana. Briana sat next to Johnstone, and Hicks sat next to Briana. Dawn also arrived. She sat in the front row on the opposite side of the room, near the door. Upon arrival, Hicks said the City officials who were present were "going to see what a real court proceeding looked like today and not the s*** show that [was] put on by the City of La Salle." He also remarked they "should take notes." Trying to deescalate, Duncan responded, "okay." Hicks mumbled as he set up a video camera. (He was authorized to record the meeting.) Hicks then addressed Duncan, saying he heard Duncan "was talking s*** about him." Again trying to deescalate, Duncan told Hicks "there was nothing that [he] had said that he and Hicks hadn't already talked about."

¶ 31    According to Duncan, Hicks "was very agitated," so Duncan kept "a pretty tight eye on him." Hicks "kept leaning forward in his chair and looking at [Duncan]." Hicks then asked "what [Duncan] was looking at" and asked Duncan "if [he] wanted to go outside." Duncan asked why they would go outside and what they would do once there. Hicks sat back and began mumbling. Seconds later, however, Hicks leaned forward, pointed at Duncan, and said—in a "whispering yell"—"When I see you outside, I'm going to whip the f*** out of you." Fay heard Hicks say, "If I ever see you outside, I will whoop your a***." Duncan and Fay acknowledged their testimony on what exactly Hicks said differed slightly from what they had told police on February 29.

¶ 32    Whatever the statement was, Duncan believed it was a "serious threat" to batter him. According to Fay, Hicks was "upset" and "angry" when he made the statement. Fay, too, believed Hicks's statement was a threat, though he did not believe Hicks would carry out the threat at that exact moment. Hicks's statement made Duncan "very nervous" and concerned for his own and

7

others' safety at his workplace. Duncan's concern was the product of the verbal threat; Hicks's escalating obsession, anger, and agitation; and Hicks's recent behavior online and at city council meetings.

¶ 33     Duncan did not report Hicks's statement to a court security officer who was present at the meeting. Instead, he remained in his seat and texted Chief Smudzinski to let him know what Hicks had said. Duncan felt this was his safest option, and he did not want to escalate the matter by reporting the threat in Hicks's presence. Chief Smudzinski told Duncan that a deputy would come talk to him immediately after the meeting. After the hearing ended, Duncan remained in his seat. According to Duncan, the deputy "came in and sat next to [him] while Mr. Hicks was watched until he had left the courthouse."

¶ 34     Hicks and Dawn provided a different account of the February 29 meeting. Hicks denied threatening to "whoop [or beat] Duncan's a***" at the meeting. He also denied asking Duncan to go outside. According to Hicks, Duncan was staring at him, "giving [him] a threatening look." Hicks asked Duncan, "Why are you looking at me that way? Do you want to go outside or something?" Hicks ignored Duncan thereafter, because "[he] wasn't there for *** Duncan."

¶ 35     Dawn testified she attended the February 29 meeting and sat in the second row, in the chair closest to the door. She heard Hicks say to Duncan, "What is your problem? You act like you want to go outside or something." Dawn turned around and saw Duncan "making faces, almost as an antagonation [sic] kind of thing." Dawn said to Hicks, "[D]on't engage, ignore him. He's just trying to get you out of here so you don't get your say in the hearing." Hicks told Dawn, "I'm not going to let him get to me." She did not hear Hicks say he was going to "whoop [or kick] Duncan's a***." Dawn believed it "highly implausible" that she did not hear something that was said because the courtroom was small. After this interaction, the meeting proceeded as normal. Dawn and Hicks

8

walked together out of the meeting and to Hicks's truck. No security or police officers approached them, and they went their separate ways.

¶ 36                                  C. The Court's Ruling

¶ 37        After hearing summations, the trial court entered a one-year plenary workplace restraining order. The order prohibited Hicks from having "direct or indirect contact with *** Duncan through telephone calls, mail, e-mail, faxes, written notes, and communications by himself or through third parties." It also ordered Hicks to stay away from city hall, the police station, the public library, the public works garage, and the wastewater treatment plant.

¶ 38        Explaining its ruling, the court found the City had "easily met" its burden to prove, by a preponderance of the evidence, that Duncan believed Hicks made a credible threat of violence to be carried out at the workplace under section 15(2) of the Act. The court found credible the City's evidence that Hicks made a threat at the February 29 Pollution Control Board meeting. It also gave no weight to Hicks's evidence on the matter, finding his testimony not credible. Commenting further, the court emphasized Hicks's demeanor could not be captured by the hearing transcript alone. It stated, "[Hicks was] testifying within five feet of me at all times, I'm feeling uncomfortable about it. I can't imagine if this person is directing their anger at me ***." The court cited some of Hicks's online comments, describing them as "threatening statements" that were "highly, highly agitative." According to the court, the fact the February 29 threat did not occur at Duncan's workplace was insignificant. Hicks had been "planting the seeds about what [he was] capable of" through his escalating conduct and online content. The court determined that Hicks's behavior, together with the threat of violence, would lead reasonable persons to fear for their safety.

¶ 39        This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41       Hicks argues, among other things, that the trial court erroneously determined the City's evidence satisfied the Act's requirements.

¶ 42       This case requires us to answer two questions. First, we must determine what an employer must establish when, as here, it seeks a workplace restraining order under section 15(2) of the Act. Second, we must determine whether the City's evidence satisfied that burden, such that the trial court properly granted the City's petition.

¶ 43                                A. Standard of Review

¶ 44       We apply *de novo* review to the first question, as it requires us to construe the Act. *People v. Davison*, 233 Ill. 2d 30, 40 (2009) (noting the construction of a statute is a question of law that is reviewed *de novo*). To the second question, we apply the manifest weight standard, because the standard of proof in proceedings under the Act is a preponderance of the evidence. See *Best v. Best*, 223 Ill. 2d 342, 348-50 (2006); 820 ILCS 275/30(d) (West 2024) (imposing the preponderance standard in proceedings under the Act); see also *Piester v. Escobar*, 2015 IL App (3d) 140457, ¶ 12 (applying the manifest weight standard to the decision to grant a stalking no contact order).

¶ 45                           B. Construction of Section 15(2)

¶ 46       We begin with the statutory text. When construing a statute, a court must determine and give effect to the legislature's intent. *Davison*, 233 Ill. 2d at 40. The statute's text, given its plain and ordinary meaning, is the best indication of the legislature's intent. *In re Marriage of Petersen*, 2011 IL 110984, ¶ 15. Thus, when a statute is clear and unambiguous, we must apply it as written, without resort to other tools of construction. *Id.*

¶ 47 Statutory language should not be read in isolation. *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 31. Rather, "statutory language *** should be considered in the context of the entire statute" (*id.*), and a court must keep "in mind the subject it addresses and the legislature's apparent objective in enacting it." *People v. Cardamone*, 232 Ill. 2d 504, 512 (2009). Further, a court must give effect to each word used in the statute; the construction of a statute must not "render[ ] any part of it meaningless, inoperative, superfluous, or insignificant." *Hacker v. Halley*, 2021 IL App (2d) 210050, ¶ 21.

¶ 48 The Act's purpose is "to assist employers in protecting their workforces, customers, guests, and property by limiting access to workplace venues by potentially violent individuals." 820 ILCS 275/5 (West 2024). Accordingly, the Act affords *employers* the right to seek workplace restraining orders against persons who have either carried out an unlawful act of violence or made a credible threat of violence. See *id.* § 30(a) (stating an action under the Act is commenced by filing a petition); *id.* § 10 (defining the "petitioner" as "any employer who commences a proceeding" under the Act); see also *id* § 15 (providing that an employer may seek a workplace restraining order based on an "unlawful act of violence" or a "credible threat of violence" by the respondent).

¶ 49 The Act defines several key terms. Relevant to this case, a "workplace" is "any property that is owned or leased by the employer and at which the official business of the petitioner is conducted." *Id.* § 10. A "credible threat of violence" is "a statement or course of conduct that causes a reasonable person to fear for the person's safety at his or her workplace or for the safety of others at his or her workplace." *Id.*

¶ 50 Section 75 of the Act governs plenary workplace restraining orders. See *id.* § 75. It states the court "shall issue" a plenary workplace restraining order if the petitioner serves notice of the

11

hearing in accordance with the Act and "establishes," among other things, that "the requirements of Section[ ] 15 *** of this Act are satisfied." *Id.* § 75(2).

¶ 51 Section 15 of the Act sets forth four[1] grounds on which an employer may seek a workplace restraining order:

"(1) an employee has suffered unlawful violence and the respondent has made a credible threat of violence *to be carried out at the employee's workplace*;

(2) an employee believes that the respondent has made a credible threat of violence *to be carried out at the employee's workplace*; or

(3) an unlawful act of violence has been *carried out at the workplace* or the respondent has made a credible threat of violence *at the workplace*." (Emphases added.) *Id.* § 15.

¶ 52 Hicks argues section 15 of the Act required the City to show his February 29 threat was made at Duncan's workplace. He maintains that, because the La Salle County courthouse (where the threat was made) was neither owned nor leased by the City, the threat did not occur at Duncan's "workplace" as that term is defined in the Act. See *id.* § 10 (defining "workplace" as "any property owned or leased by the employer").

¶ 53 Had the City proceeded under section 15(3), Hicks's argument might have had some merit. That subsection allows the employer to seek a workplace restraining order if the respondent made a credible threat of violence while at the workplace (*id.* § 15(3)), and it is undisputed the La Salle County courthouse was neither owned nor leased by the City. Here, however, the City proceeded under section 15(2). Unlike section 15(3)'s credible threat provision, section 15(2) does not require

---

[1]While section 15 has three subsections, the third subsection's use of "or" indicates that subsection contains two distinct grounds on which an employer may seek a workplace restraining order.

the petitioner to prove the respondent made a credible threat of violence at the workplace. Thus, we reject Hicks's argument.

¶ 54    Section 15(2) requires the employer to establish "an employee believes that the respondent has made a credible threat of violence to be carried out at the employee's workplace." *Id.* § 15(2). The phrase "to be carried out at the employee's workplace" in this provision qualifies "credible threat of violence," thereby indicating the respondent's statement or course of conduct that composes the credible threat of violence (see *id.* § 10) must contemplate a future act to be performed at a specific location: the employee's workplace. Essentially, then, an employer must prove two things when proceeding under section 15(2). The employer must prove the respondent made a "credible threat of violence" as that phrase is defined in section 10 of the Act. And the employer must prove the respondent's credible threat of violence was one to be carried out at the employee's workplace.

¶ 55    In so holding, we note that any other construction would render section 15(2)'s use of "to be carried out at the employee's workplace" superfluous. See *Hacker*, 2021 IL App (2d) 210050, ¶ 21 (prohibiting courts from construing a statute in a manner rendering any part of it superfluous). While the definition of "credible threat of violence" requires fear for safety in the workplace context, section 15(2) ensures that the threat itself must implicate the workplace as the locus of the threatened violence.

¶ 56    Our construction of section 15(2) is consistent with the remainder of section 15, which reflects an intent to limit relief to threats with a clear nexus to the workplace. See *Slepicka*, 2014 IL 116927, ¶ 31 (noting a statutory provision must be read in the context of the entire statute). Section 15 makes clear an employer must establish the respondent engaged in some conduct that has some past or future connection to the workplace. See 820 ILCS 275/15 (West 2024) (requiring

13

a credible threat of violence "to be carried out at the employee's workplace" or to have been made "at the workplace" or an unlawful act of violence to have been "carried out at the workplace"). Section 15(2)'s emphasis on threats to the workplace is also consistent with the Act's purpose (see *Cardamone*, 232 Ill. 2d at 512), which is to help employers protect not only their workforces, but also their patrons and property, from future acts of violence or threats of violence at the workplace "by limiting access to workplace venues by potentially violent individuals." 820 ILCS 275/5 (West 2024); see also *id.* § 15 (stating a workplace restraining order may be sought "to prohibit further violence or threats of violence by the respondent"). Against this backdrop, section 15(2)'s workplace-nexus requirement is grounded in the Act's purpose of preventing violence where it most directly threatens employees, patrons, and work operations.

¶ 57                      C. The City's Evidence Failed to Satisfy Section 15(2)

¶ 58          The City homes in on section 15(2)'s use of "credible threat of violence" and argues the evidence presented met the Act's definition of that phrase. We do not disagree that Hicks's course of conduct—his escalating behavior at city council meetings, his online content, and his February 29 threat—could "cause[ ] a reasonable person to fear for the person's safety at his or her workplace or for the safety of others at his or her workplace." *Id.* § 10. The evidence showed that Hicks knew where Duncan was employed and had become increasingly angry and aggressive toward City employees, ultimately culminating in a threat to commit a battery against Duncan. Given these facts, a person in Duncan's position could reasonably fear for his safety and the safety of others at his workplace.

¶ 59          That said, the record does not reveal any statement or course of conduct directly threatening Duncan's workplace. Absent direct evidence, the requisite workplace nexus may be established inferentially through circumstantial evidence. *Mann v. Producer's Chemical Co.*, 356 Ill. App. 3d

14

967, 974 (2005). An inference drawn from circumstantial evidence must be reasonable and probable, not merely possible. *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 739 (1996). Indeed, a conclusion drawn from circumstantial evidence "must be the only probable conclusion" based on the known facts. *Id.*

¶ 60    Hicks's escalating behavior at city council meetings and his online content did not have a connection to Duncan's workplace as required by section 15(2). As to Hicks's escalating behavior at city council meetings, the evidence showed that Hicks had become increasingly agitated, aggressive, and disruptive during city council meetings in November and December 2023. He interrupted meetings by shouting obscenities from the back of the council chamber. His disruptions led to him being removed from two city council meetings. However, no evidence showed that Hicks's disruptions included threats of violence, let alone violence to be carried out at Duncan's workplace.

¶ 61    As for Hicks's online content, Duncan testified Hicks had said "he wasn't going to stop until someone down at City Hall was hanging from a noose." However, Hicks's actual statement was, "Don't worry man, I'm not giving up until somebody is hanging on some f*** noose somewhere and paying the pied f*** piper his f*** fee." Hicks made no specific reference to any City employee or to committing any violence at city hall. The remaining three videos, though they addressed Duncan personally, contained no threats of violence to be carried out at the workplace. Rather, they concerned Duncan's anatomy and his alleged "womanizing" and untruthfulness and Hicks's belief that the hearing on the plenary order would vindicate him.

¶ 62    Turning to Hicks's February 29 courtroom threat, both Duncan and Hicks testified that, as of that date, Hicks had already begun directing anger at Duncan based on what occurred at the February 5 city council meeting and during its aftermath. On that date, Duncan attended the

15

Pollution Control Board meeting in his capacity as the City's finance director. He sat in the back of the courtroom with Fay and Johnstone. Hicks attended with his daughter and sat three seats away from Duncan. Immediately upon his arrival, Hicks taunted Duncan and Duncan's coworkers, saying they would see "what a real *** proceeding looked like" and "should take notes." Because Hicks was "very agitated," Duncan kept an eye on Hicks. Hicks responded by asking Duncan "what [Duncan] was looking at" and "if [Duncan] wanted to go outside." After Duncan asked Hicks what would happen if they went outside, Hicks sat back before leaning forward and saying, "When I see you outside, I'm going to whip the f*** out of you."

¶ 63        Notwithstanding its seriousness, Hicks's threat to batter Duncan "outside" was not a threat to be carried out at Duncan's workplace. Crucially, the word "outside" does not reasonably link Hicks's threat to Duncan's workplace. "Outside" may be understood contextually, that is, in relation to the location of the specific courtroom where the threat was made. See Merriam-Webster's Collegiate Dictionary 882 (11th ed. 2020) (defining the adverb "outside" as "on or to the outside"). Under this reading, Hicks's threat was restricted to the vicinity of the courthouse, which is not Duncan's "workplace" under the Act. See 820 ILCS 275/10 (West 2024). "Outside" may also be understood more broadly to encompass any outdoor public space where Hicks and Duncan might conceivably cross paths in the future, including, admittedly, City-owned or City-leased property. See Merriam-Webster's Collegiate Dictionary 882 (11th ed. 2020) (defining the adverb "outside" with a synonymous cross-reference to "outdoors"). Under this reading, the word "outside" sweeps so broadly that Duncan's workplace is merely one of innumerable possible locations. A mere possibility cannot sustain a reasonable inference. *Stojkovich*, 281 Ill. App. 3d at 739. If we accept this reading, "outside" does not point to any specific location and could just as easily refer to a park, bus stop, or any other nonworkplace location. Selecting Duncan's workplace

16

from an unlimited set of hypotheticals is not an inference; it crosses into the realm of speculation and conjecture. A word so open-ended cannot support a conclusion that Duncan's workplace was "the only probable" site of the threatened violence. See *id.* Indeed, Hicks never expressly or impliedly threatened to commit a battery at any City-owned or City-leased property. Any such conclusion is speculation and would effectively eliminate section 15(2)'s workplace-nexus requirement. In short, there is no reasonable basis to conclude the February 29 threat was one "to be carried out at the employee's workplace." 820 ILCS 275/15(2) (West 2024).

¶ 64     We recognize that we have parsed out Hicks's conduct underlying the City's petition for a workplace restraining order. Considering the conduct together, however, we conclude the City failed to establish Hicks's course of conduct was a credible threat of violence to be carried out at Duncan's workplace.

¶ 65     Simply put, the City failed to elicit any evidence that would support a finding that Hicks's threat was "to be carried out at the employee's workplace." *Id.* And because the City failed to do so, the trial court's judgment was against the manifest weight of the evidence. In reaching this conclusion, we have not reweighed the evidence or second-guessed the trial court's credibility determination. See *Eychaner v. Gross*, 202 Ill. 2d 228, 270 (2002) (noting the reviewing court may not reweigh evidence or substitute its judgment for that of the trier of fact). We have simply determined the City produced no evidence to meet its statutory burden to show the credible threat of violence was one "to be carried out at the employee's workplace." Accordingly, we reverse the trial court's judgment.

¶ 66                    D. Mootness Exception

¶ 67     Before concluding, we note this appeal was rendered formally moot when the plenary workplace restraining order expired on May 3, 2025. See *Landmann v. Landmann*, 2019 IL App

17

(5th) 180137, ¶ 11 (expiration of a plenary domestic violence order of protection rendered the appeal formally moot). Ordinarily, we avoid deciding moot issues, but we may do so when an issue presented falls within a recognized exception to the mootness doctrine. *In re Carolyn J.S.*, 2024 IL App (3d) 220249, ¶ 19. One such exception is the public interest exception, which allows us to address the merits when "(1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officials; and (3) there is a likelihood of future recurrence of the question." *In re Alfred H.H.*, 233 Ill. 2d 345, 355 (2009).

¶ 68    We find the public interest exception applies here. As to the first criterion, this case presents a question of a public nature. We acknowledge that Hicks essentially challenges the sufficiency of the City's evidence and that such challenges generally "do not present the kinds of broad public issues required for review" under this exception. *In re Rita P.*, 2014 IL 115798, ¶ 36. However, this case also involves the proper construction of section 15(2) and what evidence that section requires, a matter generally applicable to all matters involving that section. See *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002) (recognizing that procedures to be followed and proofs to be made for involuntary mental health treatment were "matters of a public nature and of substantial public concern"). Moreover, our legislature has recognized that the prevention of unlawful violence and the threat of it at the workplace are matters of public concern (820 ILCS 275/5 (West 2024)), and the public has an interest in ensuring courts correctly apply the Act to fulfill its purpose. See *Whitten v. Whitten*, 292 Ill. App. 3d 780, 784 (1997) (finding the public interest exception applied to an emergency domestic violence order of protection because the statute's purpose could be achieved only if courts properly applied the statute); *In re Amanda H.*, 2017 IL App (3d) 150164, ¶ 29 (noting a court's compliance with a statute is a matter of public concern).

18

¶ 69     As to the second criterion, we find it desirable to provide an authoritative determination for the future guidance of public officials. The issue presented is one of first impression. See *In re Shelby R.*, 2013 IL 114994, ¶¶ 20-21 (noting matters of first impression may satisfy the criterion of whether an authoritative determination is desirable). The Act became law in January 2014 (Pub. Act 98-430 (eff. Jan. 1, 2014) (adding 820 ILCS 275/1 *et seq.*)), yet our research has revealed only one decision squarely addressing the Act. That decision does not address the issue presented here. See *Koby v. Northwestern Memorial Healthcare*, 2025 IL App (1st) 250115-U (discussing the circuit court's authority to extend a plenary workplace restraining order beyond its original one-year term).

¶ 70     As to the third criterion, we find it reasonably likely that this issue will recur. To be sure, section 15(2) is but one of four grounds on which an employer may seek a workplace restraining order. However, the proper construction of section 15(2) is applicable to all proceedings brought under that section, such that it is likely to recur. Accordingly, we find the public interest exception applies to the issue presented in this appeal.

¶ 71                                   III. CONCLUSION

¶ 72     For the reasons stated, we reverse the judgment of the circuit court of La Salle County.

¶ 73     Reversed.

¶ 74     PRESIDING JUSTICE BRENNAN, dissenting:

¶ 75     While I agree with the majority that the City met its burden to prove by a preponderance of the evidence that Hicks made a credible threat of violence, I disagree that it failed to demonstrate that the threat was one to be carried out at Duncan's workplace. Under the totality of the circumstances, although Hicks did not explicitly identify a City-owned or City-leased property in his threat, it was reasonable to conclude the threat was directed against Duncan "outside" his

19

workplace. Accordingly, I would affirm the trial court's decision to issue the plenary workplace order of protection.

¶ 76    Hicks stated either, "When I see you outside, I will whoop your a**," (according to Duncan) or "If I ever see you outside, I will whoop your a**" (according to Fay). The dispositive question, then, is whether this threat can, under the totality of the circumstances, be construed as including "outside" of Duncan's workplace. A commonsense assessment of the record suggests exactly that. Either statement, as recalled by Duncan or Fay, communicated a standing threat to Duncan any time Hicks encountered Duncan "outside." The threat was not limited to when Duncan was outside of the La Salle County courthouse.

¶ 77    Duncan is a 10-year employee of the City who presumably must regularly enter and exit City-owned or City-leased buildings, which necessarily involves Duncan being "outside." Hicks has been a regular attendee of city council meetings over a several-year period, where he has expressed increasing aggravation concerning an alleged cover-up involving a fire in the community. Leading up to the Pollution Control Board meeting where Hicks directly threatened Duncan, Hicks had been forcibly removed from city council meetings, the last time with Duncan assisting the chief of police in Hicks's removal. Between the removal of Hicks where Duncan was involved and the Pollution Control Board meeting, Hicks began to specifically mention Duncan and Duncan's family in his social media postings. Significantly, all these escalating interactions and postings resulted from Hicks's angst with the City and City employees, including Duncan.

¶ 78    Under the totality of the circumstances, it follows that, when Hicks threatened physical violence against Duncan when he found him "outside," this included outside City-owned or City-leased property. The trial court's conclusion in this regard was certainly not against the manifest weight of the evidence.

20

¶ 79        I respectfully dissent.

*City of La Salle v. Hicks*, 2025 IL App (3d) 240351

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of La Salle County, No. 24-CH-6; the Hon. Jason Helland, Judge, presiding. |
| **Attorneys for Appellant:** | Jamie M. Hicks, of LaSalle, *pro se*. |
| **Attorneys for Appellee:** | Allen Wall and Daniel W. Bourgault, of Klein, Thorpe & Jenkins, Ltd., of Chicago, for appellee. |