**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250421-U

Order filed January 8, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| LYNLEY LOUZENSKY | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| Petitioner-Appellee | ) | Kankakee County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-25-0421 |
| | ) | Circuit No. 25-OP-312 |
| MICHAEL CLINTON, | ) | |
| | ) | Honorable |
| Respondent-Appellant. | ) | Scott N. Sliwinski |
| | ) | Judge, Presiding. |

_____

JUSTICE DAVENPORT delivered the judgment of the court.
Presiding Justice Hettel and Justice Bertani concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   The evidence did not permit an inference that respondent acted for the purpose of sexual gratification or arousal. The civil no contact order is reversed.

¶ 2     Petitioner, Lynley Louzensky, petitioned for an order under the Civil No Contact Order Act (Act) (740 ILCS 22/101 *et seq.* (West 2024)) against respondent, Michael Clinton. The petition sought to protect respondent and the parties' two minor daughters. The court *ex parte* entered an emergency no contact order and later, after a contested hearing, entered a plenary no contact order that expires on July 29, 2027.

¶ 3 Respondent appeals, arguing the court's plenary order was against the manifest weight of the evidence. We agree and, therefore, reverse the trial court's judgment

¶ 4 I. BACKGROUND

¶ 5 A. The Parentage Action Involving the Parties

¶ 6 Petitioner and respondent are former romantic partners. Together they have two minor daughters, E.C., born June 10, 2014, and L.C., born June 1, 2016. In 2017, petitioner commenced a parentage action. In February 2020, the court entered an agreed allocation judgment, under which the parties shared decisionmaking responsibilities and petitioner had the majority of parenting time.

¶ 7 In January 2023, the court modified the allocation judgment, granting respondent sole decisionmaking responsibilities and the majority of parenting time. Petitioner was granted unsupervised parenting time on every other weekend, beginning at 4:30 p.m. on Thursdays and ending at 8 a.m. on Mondays. In its order, the court found the parties "have a toxic relationship" and were unable to communicate and make shared decisions.

¶ 8 B. Petitioner's Petition for a Civil No-Contact Order

¶ 9 On May 12, 2025, petitioner filed her petition for a civil no-contact order against respondent. She alleged the following. Sometime between May 4 and May 9, 2025, L.C. woke up thirsty in the middle of the night. She woke respondent and asked for water. Respondent told her to lie down with him and he would get her water. L.C. said no and repeated her request for water. Respondent again told L.C., "no, lay down with me and I'll get you water." L.C. again said no and asked a third time for water. Respondent again told L.C. to lie down with him. While L.C. lay in respondent's bed, respondent touched her breast. L.C. tensed up, and respondent said he thought it was her back. Respondent then pulled up the oversized T-shirt L.C. was wearing and "rubbed

2

her naked back." L.C. slept the entire night in respondent's bed. L.C. told petitioner that respondent's "body was very close to hers, explained a 'spoon-like' sleeping arrangement." L.C. told petitioner she "was scared and did not like it," asked "why *** she ha[d] to do what he wanted her to do for water," and "was uncomfortable and did not feel safe."

¶ 10    Petitioner sought an order requiring respondent to stay at least 500 feet away from her, L.C., and E.C., prohibiting respondent from entering or remaining at her residence and the children's schools, and prohibiting respondent from having any contact with them.

¶ 11                    C. Emergency Civil No Contact Order

¶ 12    That same day, the court *ex parte* entered an emergency civil no contact order, granting the relief sought in the petition. In addition, the court suspended respondent's parenting time until further order of court. The emergency order expired on June 2, 2025, and was extended until July 29, 2025, for a hearing on whether a plenary order should issue.

¶ 13                            D. Hearing

¶ 14    At the July 29 hearing, the parties presented the following evidence.

¶ 15                        1. *Petitioner's Evidence*

¶ 16                            a. Petitioner

¶ 17    Petitioner testified she lived with E.C. and L.C., who at the time of the hearing were 11 and 9 years old, respectively, and their infant half sister. At 8 a.m. on May 11, 2025, which was Mother's Day, respondent dropped off E.C. and L.C. at her house so she could have parenting time. They "had presents" and made breakfast, before going to Kankakee River State Park for a picnic lunch in the afternoon. During lunch, L.C. "brought something up" (presumably the allegations underlying the petition) to petitioner in front of E.C. and the half sister. During the conversation, L.C. was "very sure of herself" and "very assertive." Later in the afternoon, they left

3

the state park, went home to gather some items, and drove to the Grove, a park in Bourbonnais, where they met the half sister's aunt for "a little Mother's Day get-together." Petitioner discussed with the aunt what L.C. had reported to her because it "was really bothering [petitioner]."

¶ 18 Petitioner did not return E.C. and L.C. to respondent after the conclusion of her parenting time. Instead, she kept the children with her. She sent a message to respondent, telling him, in summary, "the girls were going to stay with [her] because there was a police investigation and a DCFS investigation." Respondent did not respond to her message. Petitioner did not tell respondent what the investigation concerned but would have if he had responded to her message. The next day, she met her lawyer at the courthouse and filed the petition.

¶ 19 b. L.C.

¶ 20 At petitioner's request and over respondent's objection, the court examined L.C. in chambers in accordance with section 215.5 of the Act. 740 ILCS 22/215.5 (West 2024). The court stated neither party would be allowed to question L.C. but allowed the parties to submit potential questions to be asked of L.C.

¶ 21 L.C. stated that, one or two days before Mother's Day, she woke up in the middle of the night to get some water. Because she was scared to go downstairs alone, she went to respondent's room, and respondent woke up. According to L.C.,

"I said, dad, can you get me some water? And he said, no, come lay down with me first then I'll get you some water. And I said, dad, can you just get me some water? And I said that like repeatedly. So I said that three times. And the third time I didn't want to—because I was tired and I wanted to get water so I just laid down with him.

He went downstairs to get me water, came back. And I was like laying like straight. Like I wasn't turned, I was like straight facing the ceiling, and he—I think he might have

4

been on his phone, but he—but I don't—I don't know for sure. And he rubbed—like he rubbed my breasts. And he said, oh, sorry, I thought that was your back. And I didn't know what to say so I just said, oh, it's okay."

¶ 22 L.C. then turned over, and respondent "went under my shirt and started rubbing my back." L.C. was not wearing shorts, and respondent "started like getting close to my butt." L.C. said the incident made her feel "very uncomfortable." She did not say anything to respondent, however, because she was "scared" and "didn't know what to say at that moment."

¶ 23 When asked whether respondent had touched her inappropriately in the past, L.C. responded, "not quitely [*sic*]." L.C. stated respondent would rub her and E.C.'s backs under their shirts, touching "really close" to their breasts.[1] According to L.C., this "happen[ed] a lot." She explained respondent had "been like going under our backs [*sic*] and rubbing our backs since we were little," though it happened less frequently after they lofted their beds at some point when she was eight years old.

¶ 24 L.C. stated she did not discuss the touching with her mom at the park. Rather, she brought it up when they got home. She knew what had happened was "very inappropriate." Petitioner asked L.C. whether she thought it was an "accident or on purpose," and L.C. told her it was "on purpose." When the court asked L.C. why she felt it was on purpose, L.C. responded, "Because [respondent] like touched us in like different parts a lot like how I told you, like about getting close to us, like really close. And I—and it—it felt like it was on purpose because it felt like he meant to do it."

¶ 25 The court asked L.C. whether she had spoken with anyone about what she should say in court. According to L.C., she "practiced" with petitioner before the end of the school year. She

---

[1]At one point, L.C. was indicating where on her body respondent would touch but neither the court nor the parties' attorneys stated on the record where exactly she was indicating. Based on context, we believe she was indicating near her breasts.

5

practiced giving her name and street address. She also practiced giving "the details" of what happened. L.C., however, stated that everything she said had actually happened.

¶ 26                      2. *Respondent's Motion for a Directed Finding*

¶ 27        Petitioner rested, and respondent moved for a directed finding. The court noted the Act's definition of "sexual conduct" was an "intentional or knowing touching or fondling by *** the respondent to the petitioner either directly or through clothing of the sex organs, anus, or breasts of the petitioner or any *** body part of a child under the *** age of 13." Finding evidence had been presented of such conduct, the court denied the motion.

¶ 28                             3. *Respondent's Evidence*

¶ 29                               a. Molli Wixom

¶ 30        Molli Wixom testified she was a forensic interviewer and child advocate at the Grundy County Children's Advocacy Center (CAC). She had performed approximately 50 victim sensitive interviews. In May 2025, Wixom conducted a victim sensitive interview with L.C. Present in an observation room, which received a live feed of the interview, were Minooka police detective Denise Kentgen, the CAC's executive director, the Grundy County State's Attorney, and a representative from DCFS. Wixom had received a police report and a DCFS report before the interview and was aware of the allegations.

¶ 31        L.C. told Wixom what happened, and L.C.'s statement was similar to what was stated in the police report. L.C. said respondent had touched her chest when she wanted to get water and apologized. L.C. reported it was normal for respondent to rub her back and said there was nothing "odd" about that. During the interview, L.C.'s demeanor was "flat" and L.C. "didn't come off as emotional." L.C. did not seem confused or unsure about what had happened with respondent. L.C. used words that "seemed big for her at that age." L.C. also "mention[ed] *** something about

6

when she was six months old" and mentioned that respondent "got enough money and *** stole the children from [petitioner]." According to Wixom, this did not seem developmentally appropriate and "suggest[ed] possibly being told that information."

¶ 32    At the interview's conclusion, Wixom spoke with petitioner, handed her a resource packet, and told her to contact CAC if there was anything else she needed.

¶ 33                          b. Detective Kentgen

¶ 34    Detective Kentgen watched L.C.'s victim sensitive interview from the observation room. Before the interview, she had received a report from the referring police department and a DCFS form and was familiar with the allegations. She also spoke with respondent.

¶ 35    During L.C.'s interview, L.C. disclosed that while she was lying in respondent's bed, respondent "grabbed or stroked or rubbed the front of her chest in the breast area." L.C. said that "she kind of jumped" and respondent apologized, saying he thought it was L.C.'s back. L.C. remained in respondent's bed and gave no indication that she felt compelled to do so. L.C. also said it was common for respondent to rub her back under her shirt and it did not bother her. The only time L.C. was made uncomfortable by respondent's touching was when he touched her breasts on the night in question. L.C. "seemed like a normal kid" during her interview. She was not distraught but had concerns about returning to respondent's care.

¶ 36    At the conclusion of the interviews, Detective Kentgen decided, with the advice of the State's Attorney, to close the investigation because nothing indicated anything illegal had happened. Detective Kentgen informed petitioner of her decision, telling petitioner there had been no "outcry or indication of anything illegal occurring or anything criminal in nature occurring." She also told respondent that her department's investigation would be closed. The next day, petitioner called Detective Kentgen. Petitioner expressed concerns about Wixom's training and

7

asked what her credentials were. She also had concerns about Wixom's use of the words "boobs," stating that was "difficult for her girls to hear." Detective Kentgen inferred from this statement that the girls were unfamiliar with the term. Detective Kentgen referred petitioner to the CAC.

¶ 37    On cross-examination, Detective Kentgen testified she did not interview respondent about L.C.'s allegations. She explained that she did not question respondent about the allegations because no "outcry" had been made. Petitioner's counsel asked whether L.C.'s statement to petitioner was an outcry, and Detective Kentgen responded, "upon further investigation the only statement that she made was that her dad touched her in the breast area and she felt it was an accident." Detective Kentgen later clarified, however, that L.C. did not say she believed respondent's touch was an accident. During the victim sensitive interview, L.C. said "it didn't feel like an accident that he touched her breasts because she does not trust him anymore." However, L.C.'s statement relating to trust did not refer to the touching; it referred to respondent's disciplinary methods and prohibiting her from going into the garage and a closet.

¶ 38    Upon the court's examination, Detective Kentgen explained what she believed was an outcry—"a child, or an adult *** saying that something inappropriate happened with somebody like of a sexual nature ***. That is what we are looking for." The court also asked her why she believed that L.C. thought the touching was an accident:

> "When she was in the interview and she said that her dad told her to get into bed, he'll get the water for her, and that it was—she implied, I guess maybe she didn't say it outright, that it's common for—in order for her to go back to bed, that [respondent] rubs the back.
>
> So in speaking with her or in listening to the interview *** that it was common for him to try to put her back to bed. So by rubbing her back under her shirt, common, didn't

8

ever make her feel uncomfortable, didn't make her feel any sort of way. It was just kind of what [respondent] did.

So it was—when it was talked about in the [victim sensitive interview], it seemed like it was an accident, that *** [respondent] may have thought *** that she was already on her stomach and he was just gonna rub her—rub her back to go to bed. So that's how it came off in the interview.

So she—after the incident occurred of him rubbing the breast area, she turned over and he continued to rub the back area and apologized, sorry, and they went on normal— like a normal night. So that's how I got that inference from that interview."

¶ 39                                  c. Respondent

¶ 40        Respondent testified it was normal for him to rub the children's backs as they went to sleep and had done so since they were little. Neither child had ever indicated this made them uncomfortable. In fact, they asked him on occasion to do so. Respondent denied ever touching near their buttocks when he rubbed their backs and denied ever touching the children inappropriately.

¶ 41        Respondent has a king-size bed and sleeps with pillows on either side of him. On the night in question, respondent was on call for work. He put E.C. and L.C. to bed at about 8 p.m. L.C. wore an oversized T-shirt to bed. Respondent went to sleep at 9 p.m. At about 11 p.m., he took a work call in the living room downstairs. The call ended around 2 a.m., and he went right to bed, falling asleep within 10 minutes. He wore shorts and a tank top.

¶ 42        Sometime after 2 a.m., L.C. came into his room, which woke him up. L.C. said she was thirsty and asked for water. L.C. started to leave, and respondent told her she could come lie in his

9

bed. L.C. "immediately came" and lay in his bed. It was not unusual for L.C. to come to his room during the night and sleep in his bed.

¶ 43        Respondent went downstairs to get her water and brought it back to her. L.C. drank the water, and respondent lay down on his side, facing L.C., and closed his eyes. The lights and a television in his room were off. Respondent explained he reached over the pillow that was between them to rub L.C.'s back. Respondent "immediately felt that it was *** her front, not her back," because he "could tell her hair wasn't there" and "could feel the indent of her shoulder." Respondent apologized, and L.C. understood it to be an accident. L.C. "immediately turned over," and respondent rubbed her back for a few more seconds before falling asleep.

¶ 44        According to respondent, L.C. did not have "any type of reaction" when he touched the front of her body. In response to his apology, L.C. said, "that's okay." L.C. slept in respondent's bed for the rest of the night. Respondent believed the next day was a school day. In the morning, L.C. did not bring up what had happened, and respondent did not receive a call from the school concerning the allegations underlying the petition.

¶ 45        Respondent testified petitioner had previously accused him of abusing their children. The first accusation was that respondent molested E.C. "in December 2016 into 2017," and the second accusation was in 2021. DCFS investigated both accusations and determined they were unfounded. DCFS also investigated the incident underlying the petition and determined the report was unfounded.

¶ 46        On cross-examination, petitioner's counsel repeatedly attempted to elicit from respondent an admission that he had touched L.C.'s breast, and respondent denied having done so. He acknowledged he touched her chest area, near her shoulder. When asked why, then, he felt the need to apologize, respondent explained, "Because I felt like I should. It was close to where her

10

breast is and I didn't want her to think that I was intentionally trying to touch her. I immediately said I'm sorry. And then she said, you know, it's fine. She rolled over and I rubbed her back."

¶ 47                               E. Closing Arguments and Ruling

¶ 48        The parties gave closing arguments. In her argument, petitioner did not address whether respondent touched L.C. for the purpose of his or L.C.'s sexual gratification or arousal. The court briefly took the matter under advisement before ruling from the bench:

> "The Court has found that [L.C.] was a credible witness and she was consistent in her testimony today and her reported testimony in her [victim sensitive] interview. The Court did take note of the preparation that she testified to. The Court was concerned about the preparation she noted, but that preparation did not diminish her credibility in the Court's eyes.
>
> The Court further notes that law enforcement's inferences were not consistent with [L.C.'s] reported interview testimony. It was unrebutted that [L.C.] did make an outcry to [petitioner] on Mother's Day.
>
> Mr. Clinton, by inviting [L.C.] into his bed at 2:00 a.m., making no admission of accidentally touching her breasts, along with an admitted apology, give this Court reason to question his credibility.
>
> The petition for a plenary civil no contact order is granted, the plenary order to issue consistent with the temporary order for a two year period."

The court entered a written order consistent with its oral ruling, granting the same relief as was granted in the May 2025 emergency order.

¶ 49        This appeal followed.

¶ 50                                    II. ANALYSIS

11

¶ 51    On appeal, respondent argues the trial court's plenary civil no contact order was against the manifest weight of the evidence. Specifically, he contends (1) the trial court's finding that his touching was intentional was against the manifest weight of the evidence, (2) petitioner failed to present any evidence from which it could be inferred that he touched L.C.'s chest for the purpose of his or L.C.'s sexual gratification or arousal, (3) the trial court failed to consider petitioner's history of false abuse accusations against respondent and "erred in not considering the very real possibility that [petitioner's] emergency petition *** was simply yet another effort to harm her former partner and separate him from the parties' children"; and (4) the trial court gave insufficient weight to the evidence that L.C. had "practiced" with or had been coached by petitioner.

¶ 52    We find respondent's second contention dispositive and therefore address only that contention. We begin, however, with a brief overview of the Act and the standard of review.

¶ 53                                    A. The Act

¶ 54    The Act's purpose is to provide "a civil remedy [to sexual assault victims] requiring only that the offender stay away from the victim." 740 ILCS 22/102 (West 2024). The Act protects sexual assault victims and their families and household members. *Id.* § 201(a).

¶ 55    The filing of a petition commences proceedings under the Act. *Id.* § 202(a)(1). When, as here, the victim is a minor, another person may file the petition on the minor's behalf. *Id.* § 201(b)(2). To be entitled to a civil no contact order, a petitioner must prove the victim suffered either (1) nonconsensual sexual conduct or (2) nonconsensual sexual penetration. *Id.* § 213(a). The standard of proof in proceedings under the Act is a preponderance of the evidence (*id.* § 204(a)), meaning the petitioner must prove it is more likely than not the respondent engaged in an act of nonconsensual sexual penetration or nonconsensual sexual conduct with the victim (see *Graham v. Van Rengen*, 2024 IL App (2d) 230611, ¶ 53).

12

¶ 56                                B. Standard of Review

¶ 57        Because the Act requires proof by a preponderance of the evidence, we must determine

whether the trial court's findings were against the manifest weight of the evidence. *McClellan v.*

*Hull*, 2023 IL App (1st) 220465, ¶ 78; see *Best v. Best*, 223 Ill. 2d 342, 348-49 (2006). "A finding

is against the manifest weight of the evidence when an opposite conclusion is apparent or when

the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Vancura v. Katris*,

238 Ill. 2d 352, 385-86 (2010). Under this standard, "we give deference to the trial court as the

finder of fact because it is in the best position to observe the conduct and demeanor of the parties

and witnesses." *Best*, 223 Ill. 2d at 350. Thus, we will not substitute our judgment for that of the

trial court regarding the witnesses' credibility, the weight to be given to the evidence, or the

inferences to be drawn. *Id.* That said, " 'the manifest weight standard is not a rubber stamp' " and

" 'does not require mindless acceptance in the reviewing court.' " *People v. Harris*, 2021 IL App

(1st) 182172, ¶ 56 (quoting *People v. Anderson*, 303 Ill. App. 3d 1050, 1057 (1999)). With these

principles in mind, we turn to the merits.

¶ 58                       C. The Evidence Did Not Permit an Inference that Respondent

                          Acted for the Purpose of Sexual Gratification or Arousal

¶ 59        Petitioner alleged respondent engaged in nonconsensual sexual conduct with L.C. The Act

defines "sexual conduct," in relevant part, as "any intentional or knowing touching or fondling by

*** the respondent, either directly or through clothing, of the sex organs, anus, or breast of the

petitioner or the respondent, or any part of the body of a child under 13 years of age, *** for the

purpose of sexual gratification or arousal of the petitioner or the respondent." *Id.* § 103. Thus, to

prevail on her petition, petitioner was required to prove respondent (1) intentionally or knowingly

touched or fondled any part of L.C.'s body (because L.C. was under 13 years of age); and (2) did

13

so for the purpose of his own or L.C.'s sexual gratification or arousal. *Id.*; see *Bush v. Pedigo*, 2021 IL App (5th) 200328-U, ¶ 18 (noting sections 103 and 213 require proof that sexual acts be committed for the purpose of the victim's or the respondent's sexual gratification or arousal).

¶ 60    We turn our focus to the second element. Petitioner was required to prove the touching was for the purpose of respondent's or L.C.'s sexual gratification or arousal. Initially, we note petitioner never made any argument regarding this element in the trial court. In this court, she likewise offers no argument concerning this element even though respondent has challenged her proof on this issue. In addition, we note the trial court omitted this element when it denied respondent's motion for a directed finding and made no reference to it in its oral ruling.

¶ 61    "Determining whether an act was committed for the purpose of sexual gratification or arousal[ ] *** is typically inferred from circumstantial evidence." *In re M.G.*, 2024 IL App (1st) 232106, ¶ 31. The intent to arouse or sexually gratify may be inferred solely from the nature of the act. *People v. Burton*, 399 Ill. App. 3d 809, 813 (2010).[2] Other evidence of intent to gratify or arouse may include "the removal of clothing, heavy breathing, placing the victim's hand on the accused's genitals, an erection, or other observable signs of arousal." *M.G.*, 2024 IL App (1st) 232106, ¶ 31. The court "must consider all of the evidence—including the offender's age, maturity, actions, and statements—before deciding whether intent [to sexually gratify or arouse] can be inferred." *Id.*

¶ 62    "An inference drawn from circumstantial evidence must be reasonable and probable, not merely possible." *City of La Salle v. Hicks*, 2025 IL App (3d) 240351, ¶ 59. "Indeed, a conclusion

---

[2]We acknowledge *M.G.* and *Burton* involved criminal statutes. However, those statutes incorporated a substantively identical definition of "sexual conduct." Compare 720 ILCS 5/12-12(e) (West 2006) and 720 ILCS 5/11-0.1 (West 2018) with 740 ILCS 122/103 (West 2024).

drawn from circumstantial evidence must be the *only* probable conclusion based on the known facts." (Emphasis added; internal quotation marks omitted.) *Id.*

¶ 63     The evidence showed that on the night in question, respondent put E.C. and L.C. to bed at 8 p.m. and went to sleep himself at around 9 p.m. Approximately two hours later, respondent woke up and went downstairs to take a work phone call. After the call finished at about 2 a.m., respondent returned to his bedroom and fell back asleep within 10 minutes. Sometime later, L.C. woke up thirsty, and went to respondent's room, which woke respondent. L.C. asked respondent for water. Respondent told L.C. to lie down in his bed and then he would go get her water. L.C. again asked respondent for water, and he insisted that she lie down in his bed. After a third request for water, L.C. lay down in respondent's bed. Respondent went downstairs to get her water and returned to his bed. L.C. drank the water and lay on her back. Respondent reached over a pillow and rubbed L.C.'s breasts. Respondent immediately realized he had not rubbed L.C.'s back and apologized, saying he thought he had rubbed L.C.'s back. L.C. was "very uncomfortable" when respondent rubbed her breasts, but because she was "scared" and did not know what to say, L.C. said, "it's okay." L.C. then turned over, and respondent began rubbing L.C.'s back, underneath her shirt. While he did so, he "started *** getting close to [L.C.'s] butt." L.C. remained in respondent's bed for the rest of the night.

¶ 64     The evidence also provided additional context to the incident. For example, it was not uncommon for L.C. to come to respondent's room during the night and sleep in his bed. Both L.C. and respondent stated that respondent would often rub L.C.'s and E.C.'s backs to help them fall asleep and had done so for years. During her victim sensitive interview, L.C. said it was common for respondent to rub her and E.C.'s backs to help them fall asleep. The back rubbing did not make her feel uncomfortable, and there was nothing "odd" about it. At the hearing, however, L.C. stated

15

that respondent would get "really close" to her breasts when he rubbed her back, and that respondent stopped rubbing her back when she was eight years old, after her bed was lofted. Additionally, respondent's unrebutted testimony established that he slept in a king-size bed with a pillow on either side of him and, on the night in question, a pillow separated respondent and L.C. Respondent wore a tank top and shorts to bed and remained fully clothed during the incident. L.C. wore an oversized T-shirt and underwear and likewise remained fully clothed during the incident. The lights and television in respondent's bedroom were off throughout the entire incident.

¶ 65      We conclude the evidence does not permit an inference that respondent rubbed L.C.'s breasts for the purpose of his or L.C.'s sexual gratification or arousal. We find it is equally, if not more, likely that respondent had no sexual purpose for doing so. See *id.* (noting an inference drawn from circumstantial evidence must be the only probable conclusion based on the known facts).

¶ 66      We look first at the nature of respondent's actions. See *Burton*, 399 Ill. App. 3d at 813. On the night in question, respondent went to sleep at around 9 p.m. before waking up at 11 p.m. to take a three-hour work call. After the call, at around 2 a.m., defendant returned to his room and almost immediately fell asleep. A short time later, however, respondent was again awakened, this time by eight-year-old L.C. asking for water. In this context, we find nothing problematic with respondent's insistence that L.C. lie down in his bed, particularly where his unrebutted testimony showed it was normal for L.C. to come to his room during the night to sleep in his bed. Indeed, there is nothing inherently sexual about respondent's instruction, and it is fully consistent with the actions of a tired and frustrated parent managing a wakeful child after 2 a.m. and trying to minimize further disruption, not a parent attempting to lure his eight-year-old daughter into his bed so that he could rub her breasts.

16

¶ 67 Moreover, the evidence showed the contact with L.C.'s breasts was brief, no more than a few seconds, occurred without any gradual escalation or incremental touching, and ended with an immediate apology. Respondent then rubbed L.C.'s back, as he had done for years to help her fall asleep, before they both fell asleep. Respondent made no statement to L.C. that would suggest a sexual purpose for his actions, such as telling L.C. to keep the incident a secret or attempting to normalize or minimize the contact. Respondent did not remove his own or L.C.'s clothing. Respondent exhibited no audible or visible signs of arousal. And despite the petition's allegations that respondent slept in a "spoon-like" position with L.C. for the rest of the night, the unrebutted evidence at the hearing established that a pillow separated the two as they slept.

¶ 68 Simply put, petitioner presented no evidence—other than a momentary rubbing of the breasts—that would permit an inference that respondent touched L.C. for the purpose of his own or L.C.'s sexual gratification or arousal. Accordingly, we conclude the plenary civil no contact order was against the manifest weight of the evidence.

¶ 69 III. CONCLUSION

¶ 70 For the reasons stated, we reverse the judgment of the circuit court of Kankakee County.

¶ 71 Reversed.

17